In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-1166

JOHN BALDERSTON and JOHN GABRIEL,

*Plaintiffs-Appellants*,

*v.*

FAIRBANKS MORSE ENGINE DIVISION
OF COLTEC INDUSTRIES,[1]

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 68—**Barbara B. Crabb**, *Chief Judge*.

ARGUED NOVEMBER 13, 2001—DECIDED APRIL 17, 2003

---

[1] Although in their corporate disclosure statement defendants have listed themselves as "Fairbanks Morse Engine Division, Division of Coltec Industries," parent company "Goodrich Corporation," according to Fairbanks' web site, Fairbanks is currently a division of EnPro Industries, Inc., *see http://www.fairbanksmorse.com*, a wholly-owned subsidiary of Goodrich Corp. Coltec Industries, Inc., which is also a subsidiary of Goodrich Corporation. *See http://www.sec.gov/Archives/edgar/data/42542/000095014402001786/0000950144-02-001786-index.htm*. Correctly identifying corporate ownership is crucial as a division of a company cannot be sued. *See Schiavone v. Fortune*, 477 U.S. 21, 28 (1986).

Before HARLINGTON WOOD, JR., EASTERBROOK, and KANNE, *Circuit Judges*.

HARLINGTON WOOD, JR., *Circuit Judge*. Plaintiffs John Balderston ("Balderston") and John Gabriel ("Gabriel") brought this action under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626 ("ADEA"), against Fairbanks Morse Engine Division of Coltec Industries ("Fairbanks"), challenging Fairbanks' actions in terminating plaintiffs. Fairbanks maintains that plaintiffs lost their jobs as a result of a company reorganization and reduction-in-force ("RIF"). The district court granted summary judgment in favor of Fairbanks, finding that even if plaintiffs had established a *prima facie* case of age discrimination, they had not offered sufficient evidence to support a finding that Fairbanks' stated reasons for termination were not pretextual. Plaintiffs appeal. We agree with the district court's order and affirm.

## I. BACKGROUND

### A. Balderston

At the time in question, Fairbanks evidently was a division of Coltec Industries, which is a wholly-owned subsidiary of Goodrich Corporation. Fairbanks manufactures large engines that are sold to private and public sector customers for uses such as powering naval vessels and generating electricity for businesses and utilities. Balderston, born on June 25, 1939, began his career at Fairbanks in 1971 as an engineer and eventually became vice president and general manager of product installation and service. At the time of his termination on October 8, 1998, at age 59, Balderston was responsible for sales and profits associated with product and customer service, new engine installations, aftermarket parts sales, and remanufactured products sales, in addition to overseeing Fairbanks' customer service centers in Houston, Texas;

Norfolk, Virginia; Seattle, Washington; Beloit, Wisconsin; and Calgary, Canada.

Warren Martin, born on March 29, 1956, had been with Fairbanks since 1989 and rose from director of parts sales to vice president and general manager of parts sales. Balderston stated that at a company meeting in 1996, Martin, then Fairbanks' youngest vice president at age 42, remarked that he favored eliminating all managers over 55. Balderston, who had previously been told he might be considered as a candidate for president of the company, was already over 55. At the meeting, the executives that were present discussed the feasibility and economics of offering an early retirement package to employees over age 55. It was decided that it would not be economical to do so and could lead to the loss of key employees whose skills and experience the company wished to retain. Martin left Fairbanks in 1997 to serve as president of another division of Coltec but returned in June 1998, at age 44, as president.

Anticipating the reorganization, Martin had not considered promoting Balderston because Martin had a negative opinion of Balderston's conduct and performance as a result of his experience working with Balderston from 1989 to 1997. Martin believed that Balderston had engaged in unnecessary travel, had failed to plan trips to take advantage of low airfares, arrived for work late and left early, could not always be found during the work day, failed to treat others in an appropriate manner, failed to organize work and administrative matters, did not train field service personnel properly, and did not promote the sale of full service engine maintenance contracts adequately. Part of Martin's impressions were also based on his discussion with Balderston's former secretary, who stated that Balderston had verbally mistreated her on several occasions, causing her to resign. Affidavits of former Fairbanks' employees supported the beliefs of Martin

that Balderston arrived late for work, left early, and treated others inappropriately.

On June 5, 1998, Martin wrote a memorandum to Balderston in order to establish:

> a specific set of rules, guidelines, and expectations for your work habits, work ethic, treatment of personnel, travel and business focus going forward. The need for this meeting is brought about by my own personal experience working with you, previous input from Dick Dashnaw [former president of Fairbanks] and John Bottorff [vice president of human resources], and observations of others. I want to begin our business relationship with you knowing very clearly the types of expectations I have of you in these areas.

Martin met with Balderston that same day to discuss his requirements for Balderston: (1) to work full days and spend his time in a productive manner; (2) to pay attention to details and follow-up on the completion of projects and assignments; (3) to devote the majority of his efforts to the sale of full service engine maintenance contracts; (4) to develop the remanufactured engine program at the Houston facility; and (5) to develop and execute a comprehensive training program for all field service personnel. Balderston was told his performance would be unsatisfactory if he failed to meet the expectations outlined in the memo. On June 8, 1998, in a memo placed in Balderston's personnel file, Bottorff noted that he had spoken with Balderston about the possible outcomes of the reorganization, including demotion or replacement, and indicated that Balderston was going to try and meet Martin's expectations.

Prior to Martin's departure in 1997, Fairbanks' sales and marketing department was organized into three areas with a vice president for each division: (1) engine sales and related marketing under Barry Cockerham, born

on September 30, 1953; (2) parts sales and marketing under Barry Hall, born on September 11, 1953; and (3) service and product installation under Balderston. Upon his return, Martin wanted to consolidate the three separate areas of sales and marketing under one corporate executive, in order to create a more effective and efficient department which he felt would benefit the company as a whole.

On June 26, 1998, Martin named Cockerham, age 45, who had been vice president of engine sales since June 1997, as senior vice president of sales and marketing, overseeing all three departments. Cockerham had more than twenty years of successful sales and marketing experience at the managerial and executive levels and had experience with negotiating legal claims filed by Fairbanks' customers.

During the three-month period from July to September 1998 when Cockerham was developing the reorganization plan, a number of incidents led Cockerham to believe Balderston was not suited for a working-level management position. For example, Cockerham was unhappy with Balderston's work on a settlement agreement concerning a billing dispute with one of Fairbanks' customers. Balderston negotiated a financial settlement but had not secured a formal agreement or a release of claims signed by the customer.

Fairbanks had been trying to break into the government market and was interested in obtaining more work with the Military Sealift Command ("MSC"), which operated a fleet of vessels and was considered one of Fairbanks' important government customers. In a monthly report to Cockerham in late August 1998, Balderston stated that he was negotiating a contract with the MSC to monitor and maintain the fleet's operating condition, which he valued at $304,000 a year. However, the contract Balderston eventually secured was for $6,000 a year for engine maintenance.

Cockerham was also not satisfied with a two-day meeting/presentation in July 1998 with the MSC. Balderston was in charge and assigned the task of organizing and running the meeting to Gabriel. Cockerham attended approximately two hours of the meeting and informed Balderston that all of the presentations should have been done in PowerPoint,[2] instead of some PowerPoint and some overhead projections, that Gabriel should not have worn blue jeans, and that Balderston should have prepared written follow-up. Cockerham later found out that the MSC had agreed to prepare a written follow-up.

Balderston was also responsible for the Amocar project in 1998, which involved remanufacturing two state-of-the-art, fuel efficient, low emission EnviroDesign® engines. The project was bid on a low profit margin in order to make the sale yet stay within the customer's budget. Several problems caused cost overruns because Houston operations, which worked on the project, had no previous experience with remanufacturing an EnviroDesign® engine. As vice president of product installation and services, Balderston was responsible for controlling service cost installations. Cockerham believed that Balderston had not been sufficiently involved in overseeing the project and held him accountable for the level of cost overruns.

In August 1998, Balderston traveled to Russia because a Fairbanks' engine that had been shipped to a customer in Russia had been damaged during unloading and the customer wanted someone from Fairbanks to evaluate the condition of the engine. The customer's shipping agent stated that they would reimburse Fairbanks for Balderston's travel expenses. However, the shipping agent eventually refused to pay, leaving Fairbanks responsible

---

[2] PowerPoint is a Microsoft computerized graphics presentation program.

for $5,000 in travel expenses. Although Balderston had not requested a purchase order or letter of credit for his travel expenses, something which he had never been required to obtain for any of his previous travel, Cockerham felt it was irresponsible of Balderston to have relied on the shipping agent's letter of reimbursement.

In August and September 1998, Balderston negotiated for repair work and parts sales on the MV Nestos, a ship which had suffered a major accident. Gabriel submitted the initial bid but lost to a competitor. Balderston later submitted a bid to replace the crankshaft. That job also went to a competitor. Although Fairbanks may have lost the bid on the crankshaft because it refused a request made by the owner's representative to inflate the price of the crankshaft work for submission to the insurance company, Cockerham still felt that Balderston should have secured the contract for Fairbanks.

At the time Cockerham terminated Balderston, Cockerham believed that Balderston's service group was $1 million dollars below estimated earnings. In fact, the financial documents which Cockerham relied upon were incorrect due to a computer conversion that had started in July 1998. The error was not discovered until after Balderston was terminated. The revised financial statements indicated that as of September 30, 1998, Balderston's department was meeting the original budget and was within $15,000 of meeting a revised budget.

As part of the reorganization, Cockerham eliminated the three separate departments and reorganized sales and marketing into six departments: government programs; marketing; sales; Latin American operations; service; and Houston operations. Each department would be supervised by a working-level director who reported to Cockerham. During the restructuring, Cockerham would eliminate and consolidate any positions he determined

were unnecessary. Balderston's responsibilities were delegated to others; his responsibilities (1) for service and parts sales to commercial customers was transferred to the director of sales, (2) for service and parts sales to Latin America, South America, and Mexico was transferred to the director of Latin America operations; (3) for technical support was transferred to the director of marketing and the director of government programs; (4) for management of the Houston and Calgary operations was transferred to the director of Houston operations; and (5) for supervising the Norfolk and Seattle service and support personnel and warranty management was transferred to the director of service.

Balderston, 59, and Hall, 44, vice president of parts sales, were both demoted and no longer reported to the president of Fairbanks but to Cockerham. In addition, Cockerham was responsible for Balderston's and Hall's performance assessments. Balderston's salary was reduced from $119,150 to $102,600. Hall's salary of $88,000 was already below the minimum salary for his grade level, and was therefore not reduced further.

Hall was reassigned as director of Latin American operations because he had significant experience in Latin American sales with both Fairbanks and a former employer, had increased Fairbanks' sales in Latin and South American while vice president of parts sales, and was familiar with the customers, customs, language, and business needs of Latin America. Kurt Young, 54, was offered the position of director of Houston operations. Dennis Mowry, 42, was offered the position of director of service, which included supervision of the Norfolk and Seattle service centers and warranty management.

Following the elimination of Balderston's position, Cockerham felt that Balderston should not be retained in a director-level capacity. Balderston felt he should have

been appointed director of Houston operations. Cockerham did not appoint Balderston to any of the director positions because he thought, incorrectly, that Balderston had not held a working-level management position for several years. In fact, Balderston had served as a working-level manager in Houston. Balderston maintains that Cockerham told him that he would have a job when Fairbanks further reorganized. However, shortly after Martin and Cockerham had a meeting in September 1998 to discuss Balderston's employment, Cockerham fired Balderston. Mowry, 42, who had worked under Balderston as head of the Houston facility, replaced Balderston as head of the service department. Balderston was not considered for Mowry's former position in lieu of termination, even though Balderston had previously worked in that position.

## B. Gabriel

Gabriel, born on October 18, 1944, joined Fairbanks in 1969 and since 1986 had been a manager in Beloit, where Balderston was Gabriel's supervisor. Gabriel's primary responsibility was management of the MSC's government account.

In June 1997, Balderston reorganized the service department in Beloit and promoted Eric Ericson, born October 5, 1962, to installation and product service manager. From 1993 to 1997, Ericson had been responsible for oversight technical support to Avondale Shipyards ("Avondale"), which builds ships for the U.S. Navy and the MSC. Ericson had worked on site at Avondale in New Orleans for a number of years managing the entire support and installation effort, supervising numerous employees, and coordinating subcontractors and field support personnel. He was also responsible for controlling installation costs. Ericson continued as the company's primary contact with Avondale after the promotion to Beloit. Ericson had

excellent relations with the people at Avondale and Fair-banks had received only positive feedback from Avondale regarding Ericson's performance.

Balderston believed that the change in Gabriel's responsibilities occurring in June 1997 resulted in a deterioration of his attitude toward his job and patience with others. Although complaints had been received from customers stating that Gabriel could be confrontational and unco-operative, Balderston was not aware of these facts. Balderston had discussed with Gabriel the need to "soften his approach" in working with others. Gabriel conceded that he could be rude, terse, or inappropriate at times. Other employees complained that Gabriel was difficult.

Cockerham believed only one person was needed to act as manager of technical services for government accounts. Cockerham asked Jan Connolly, who had been manager of government programs and had worked with both Gabriel and Ericson, to select the person she wanted to fill the manager's position as Cockerham had appointed her director of government programs. Connolly selected Ericson. Connolly believed that Avondale was a complex and demanding client with numerous problems and based her decision in part on her belief that it would be easier to transfer MSC duties to Ericson rather than transferring Avondale duties to Gabriel.

Gabriel, who had been second-in-command in the service department, was fired twenty minutes after Balderston. He was 54 and the employee with the most experience in the service department. Gabriel maintains he was terminated in favor of three younger employees, Ericson, Mark Desing, and Tom Stull, and was denied consideration for a fourth opening.

Plaintiffs filed suit in the district court alleging that Balderston's and Gabriel's terminations were part of a systematic elimination of older employees through the

use of RIFs and sought relevant statistical data of the terminations of older employees beginning with Martin's initial hiring in 1989 until the termination of Balderston and Gabriel. The court limited the parameters of the data requested. Fairbanks filed a motion for summary judgment accompanied by numerous affidavits. Plaintiffs deposed Fairbanks' key affiants and responded with a memorandum and affidavits of their own. Fairbanks replied and attached thirteen new affidavits. Plaintiffs moved to strike the reply affidavits, or, alternatively, requested permission to depose the new affiants and then file a response. The district court denied plaintiffs' motion and granted summary judgment in favor of Fairbanks, ruling that plaintiffs had not established that the decisionmakers did not honestly believe the subjective conclusions given as the reasons for terminating plaintiffs.

Plaintiffs appeal (1) the order refusing to strike the thirteen affidavits submitted with Fairbanks' reply and refusing leave to take discovery with respect to the new affidavits, (2) the court's order denying plaintiffs' motion to compel discovery in order to access statistical data, and (3) the order granting summary judgment in favor of Fairbanks.

## II.  ANALYSIS

### A.  Evidentiary Issues

1.  Motion to strike affidavits

A district court's refusal to strike or disregard portions of an affidavit in a motion for summary judgment is reviewed for an abuse of discretion. *Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998).

Fairbanks filed a motion for summary judgment along with affidavits. Plaintiffs filed a response to that motion with their own affidavits. Fairbanks then filed a reply

to plaintiffs' response including additional affidavits.
Plaintiffs moved to strike the affidavits filed with the re-
ply, or, in the alternative, requested "permission to de-
pose the affiants on the new material and to file a re-
sponse." Plaintiffs challenge the district court's refusal to
strike the affidavits in the reply, contending that the
district court "relied in part on the new material asserted
in the thirteen affidavits" in granting summary judgment.

Under FED. R. CIV. P. 56(a), either party may make a
motion for summary judgment, with or without supporting
affidavits. The district court may grant judgment if "the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material
fact and the moving party is entitled to a judgment as a
matter of law." FED. R. CIV. P. 56(c). The nonmoving
party may respond, with or without affidavits, and "must
set forth specific facts showing that there is a genuine
issue for trial." FED. R. CIV. P. 56(e). Summary judgment
should not be entered "until the party opposing the mo-
tion has had a fair opportunity to conduct such discovery
as may be necessary to meet the factual basis for the
motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

Under Rule 56(a), Fairbanks was correctly allowed to
submit affidavits with its motion for summary judg-
ment. Plaintiffs were then allowed to submit affidavits
with their response to the summary judgment motion
under 56(c). There is no blanket prohibition from filing
additional affidavits when a movant for summary judg-
ment files a reply brief following a nonmovant's response.
*See Egger v. Phillips*, 710 F.2d 292, 295 (7th Cir. 1983),
*overruled on other grounds by Feit v. Ward*, 886 F.2d 848,
856 (7th Cir. 1989).

However, plaintiffs did not request a continuance "to
permit affidavits to be obtained or depositions to be taken

or discovery to be had," as allowed by Rule 56(f). A Rule 56(f) motion requires a party to set forth a justification for the continuance, which includes providing a compelling argument why discovery should be continued. *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056-57 (7th Cir. 2000). Plaintiffs failed to make a Rule 56(f) motion and failed to provide a compelling justification to continue discovery as to the new affidavits.

The district court judge believed that she was "required to consider new information that does not contradict deposition testimony and I have done so." *See Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996) ("As a general rule, the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony."); *Kalis*, 231 F.3d at 1055-56. The district court noted that although plaintiffs' affidavits in response to the summary judgment motion did not contradict plaintiffs' deposition testimony, the affidavits added "entirely new matters to 'flesh out' the deposition testimony." For instance, in his deposition, Balderston had stated that he never thought he should have been considered for Cockerham's position. But in plaintiffs' response to summary judgment, Balderston alleged that he could have been but was not considered for Cockerham's position and that Cockerham was not qualified. Many, if not all, of the plaintiffs' affidavits were submitted to refute statements and assertions made in Fairbanks' motion for summary judgment. The district court felt this was "something of an ambush" for the moving party, and, therefore, allowed all of the affidavits, those of both plaintiffs and defendants, in order to make a fair determination of the facts. However, in denying plaintiffs' motion to strike the affidavits accompanying Fairbanks' reply, the court correctly identified the new affidavits filed with Fairbanks' reply as providing cumulative informa-

tion supporting allegations in defendant's answer to plaintiffs' complaint that there were problems with both Balderston's and Gabriel's performance. These did not represent "new" arguments as plaintiffs suggest.

The district court's findings, taken from the parties' proposed findings of fact, carefully took into consideration all of the permissible evidence in determining which facts were material and undisputed. We do not find it unreasonable that the district court refused to strike the new affidavits filed with Fairbanks' reply to plaintiffs' response. *See Adusumilli*, 164 F.3d at 359 (holding that decisions "that are reasonable, *i.e.*, not arbitrary, will not be questioned") (citation omitted). In addition, in this type of situation similar to a Rule 56(f) motion, reversal of a district court's denial is made only where there is an abuse of discretion which results in actual and substantial prejudice to the party seeking additional discovery. *See Kalis*, 231 F.3d at 1055-56. We find no actual and substantial prejudice and no abuse of discretion.

## 2.  Motion to compel discovery

The standard of review of the district court's discovery decisions to not allow additional pretrial discovery is abuse of discretion. *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1152 (7th Cir. 1990). In order to succeed on a claim that the district court erroneously limited discovery, the appellant must show that "the decision resulted in actual and substantial prejudice." *Stagman v. Ryan*, 176 F.3d 986, 994 (7th Cir. 1999) (citation omitted).

Plaintiffs in this case have alleged a company-wide "campaign to elevate its more youthful employees because of their age." Plaintiffs requested discovery of extensive statistical data in order to show a pattern or practice of discrimination. *See Adams v. Ameritech Serv., Inc.*, 231 F.3d 414, 423 (7th Cir. 2000). Although statistical evidence

can be relevant to prove a pattern or practice of discrimination, it is not usually sufficient in itself. *See id.* at 423.

The Supreme Court has emphasized the importance of looking to the proper base "group" when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308, 312 (1977) (citation omitted). The defendant must then be allowed to rebut any inference of discrimination indicated by the statistics. *Id.* at 310. In *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 614 (7th Cir. 2000), the Seventh Circuit upheld summary judgment for an employer in an ADEA case where the employee's *prima facie* case was primarily composed of statistics showing that older employees were treated less favorably than younger employees in various RIFs. The appellate court determined that the statistics were flawed in a number of ways and that the plaintiff had no other sufficient evidence to support his case. *Id.* at 619-20. In order to be considered, the statistics must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and the other similarly situated employees must have shared a common supervisor; and treatment of the other employees must have occurred during the same RIF as when the plaintiff was discharged. *Id.* at 617-18.

Plaintiffs sought company-wide personnel information "on any present or former employees at the supervisor level or above," and personnel records of all employees in the parts department who were laid off, terminated, or retired between 1989 and 1998. The magistrate judge to whom the discovery issue was assigned limited the scope of plaintiffs' discovery request to employees who were similarly situated to the plaintiffs. Plaintiffs filed a motion asking the district court to modify the magistrate judge's

order but the district court declined. When requesting discovery in an age discrimination suit, the "other employees' circumstances [must be] close enough to [plaintiff]'s to make comparisons productive." *Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994). District court judges "have substantial discretion to curtail the expense and intrusiveness of discovery" in limiting an adverse party's request for broad discovery of personnel files. *Id.* (citation omitted).

The district court limited discovery to the relevant corporate department, similarly situated employees, time period, and decisionmakers. Where the district court was uncertain as to possible relevance, the judge conducted an *in camera* review of the documents, after which a determination was made. There was no abuse of discretion.

## B.  Summary Judgment

### 1.  Standard of review

We review *de novo* a district court's ruling on a motion for summary judgment. *Gordon v. United Airlines*, 246 F.3d 878, 885 (7th Cir. 2001) (citations omitted). To succeed on a motion for summary judgment, the moving party must show, through the pleadings and other record materials, such as depositions, answers to interrogatories, admissions, and affidavits, that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322-23. All evidence and inferences must be viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the nonmoving party must set forth specific facts, more than mere conclusions and allegations, sufficient to raise a genuine issue for trial; "the mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247-48 (emphasis in original); *see Celotex*, 477 U.S. at 323-24.

2. ADEA Claim

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Under a disparate treatment theory, plaintiffs must prove that their age "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 141 (2000) (citation omitted). To succeed on an ADEA claim, a plaintiff must establish that he would not have been terminated "but for" his employer's intentional age-based discrimination. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997).

A plaintiff in an age discrimination case may prove discrimination by presenting either direct or circumstantial evidence. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998). Direct evidence usually requires an admission by the decisionmaker that his actions were based on age. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Plaintiffs have not presented any direct evidence of discrimination.

Where circumstantial evidence of discriminatory intent is relied on, generally the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applied. *Reeves*, 530 U.S. at 142 (noting that *McDonnell Douglas* framework applies in ADEA cases

when parties do not dispute it). The plaintiff must first establish a *prima facie* case of discrimination, then the defendant may state one or more legitimate, nondiscriminatory reasons for its actions, after which the plaintiff has an opportunity to show that the defendant's reasons are pretextual. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

To establish a *prima facie* case, a plaintiff must demonstrate that he was in the protected age group (40 years of age and older, pursuant to 29 U.S.C. § 631(a)), was performing his job satisfactorily, suffered an adverse employment action, and was replaced by a similarly situated individual outside the protected class. *McDonnell Douglas*, 411 U.S. at 802; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310 (1996); *Gordon*, 246 F.3d at 885-86 (applying *McDonnell Douglas* test to race and age claims). However, in the case of a RIF, the fourth factor is altered slightly because "the employer decides whom from a defined group it will 're-hire' or retain, considering all existing employees as roughly like applicants for retention." *Adams*, 231 F.3d at 422; *see also Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 386 (7th Cir. 2000) (holding the *McDonnell Douglas* test is appropriate in RIF cases). The employer must then produce evidence that "having decided in good faith that he should reduce the size of his workforce, [the employer] included the plaintiff within the class of workers to be laid off for reasons unrelated to any discriminatory considerations." *Thorn*, 207 F.3d at 386. An ADEA plaintiff who shows that someone "substantially younger" was retained instead of the plaintiff need not prove that the replacement is outside the protected class. *See O'Connor*, 517 U.S. at 312. In the age discrimination context, the fact that a plaintiff is replaced by someone "substantially younger" is a reliable indicator of age discrimination. *Id.* at 313; *see Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). The

Seventh Circuit has defined "substantially younger" as generally ten years younger. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997).

a.  Balderston

  1.  *Prima facie case*

There is no dispute that Balderston belongs to a protected class or that he suffered an adverse employment action. And, viewed in a light favorable to Balderston, it could be inferred that he was performing his job satisfactorily. Therefore, we need examine only whether similarly situated employees outside the protected class were treated more favorably. *Gordon*, 246 F.3d at 886.

The plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct, and that "the retained or transferred younger employees possessed analogous attributes, experience, education, and qualifications relevant to the positions sought, and that the younger employees obtained the desired positions around the same time as the [RIF]." *Radue*, 219 F.3d at 617-18 (citations omitted).

Balderston contends that Hall and Cockerham were substantially younger and that Martin promoted Cockerham with the intent to terminate Balderston because of Balderston's age. Cockerham was 44 at the time and Balderston was 59. Balderston presented no evidence that he and Cockerham were similarly situated with respect to their qualifications, experience, skills, or abilities. *See Radue*, 219 F.3d at 618. Balderston's claim that Cockerham was unqualified for the position was based only on Balderston's own affidavit. There was no showing that Balderston had any personal knowledge of Cockerham's qualifications nor was there any evidence presented that Cockerham suffered from the same complaints, such as

tardiness and personnel difficulties, that Martin had found with Balderston, therefore, making Balderston materially different than Cockerham. *See id.* at 618-19.

Balderston stated that Hall was similarly situated and received more favorable treatment. Hall was not a similarly situated employee as his salary was already substantially lower than Balderston's, nor was he in the "general manager" classification as Balderston was. Hall also had far more extensive experience with Latin American sales than Balderston.

Balderston also claims that Mowry, age 42, was similarly situated and received more favorable treatment in that Mowry replaced Balderston when Balderston was terminated. Mowry did not replace Balderston. Balderston's duties were divided between Cockerham and six new directors. Mowry was given the supervision of the Norfolk and Seattle service centers and warranty management. Although it is true Mowry was a much younger employee whom Balderston had previously supervised, Balderston has offered no evidence as to Mowry's qualifications, education, experience, skills, or abilities. *See Radue*, 219 F.3d at 618. Nor did Balderston show that Martin and Cockerham had a negative opinion of Mowry, as they did of Balderston, making Mowry materially different than Balderston. *See id.* at 619.

### 2. Pretext

Although we need not proceed further due to the fact that Balderston has failed to satisfy the fourth prong of his *prima facie* case, because the district court assumed, for purposes of summary judgment, that Balderston could demonstrate he was similarly situated to Mowry, we briefly address the issues of Fairbanks' "legitimate, nondiscriminatory reasons" for its actions and Balderston's abil-

ity to show that Fairbanks' reasons were pretextual. *See Burdine*, 450 U.S. at 252-53.

Cockerham has stated that he chose not to retain Balderston due to Cockerham's negative opinion of him as a result of Balderston's obtaining only a minimal contract with the MSC, the loss of the bid to repair the MV Nestos, the Amocar project involving the EnviroDesign® engine, the travel expenses for Balderston's trip to Russia, the perceived failure to meet budget predictions, and Cockerham's belief that Balderston had not held a working-level manager position for several years. Because Cockerham failed to state in his deposition that his opinion of Balderston was also influenced by Balderston's failure to secure a release of claims for a settlement agreement, what Cockerham viewed as problems at the two-day MSC meeting, and service installation cost overruns, given the fact that we must view the evidence in the light most favorable to the plaintiff, those three proffered reasons are not considered.

To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision. *See Reeves*, 530 U.S. at 147. Plaintiffs must provide "evidence tending to prove that the employer's reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge," *Testerman v. EDS Technical Prods. Corp.*, 98 F.2d 297, 303 (7th Cir. 1996) (citation omitted), and that plaintiff would not have been let go but for his age. *See Burdine*, 450 U.S. at 256; *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994). In this instance, what must be provided is "proof of intentional discrimination based on an examination of all the evidence in the record viewed in the light favorable to the nonmoving party." *EEOC v. Bd. of Regents of the Univ. of Wis. Sys.*, 288 F.3d 296, 302 (7th Cir. 2002). "Where

an employer offers multiple independently sufficient justifications for an adverse employment action, the plaintiff-employee must cast doubt on each of them." *Lesch v. Crown & Cork Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) (citation omitted). The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs. *Id.* at 474.

Balderston has failed to provide evidence showing that Cockerham did not honestly believe in the reasons he stated which led him to believe Balderston's performance was not satisfactory, therefore dismissing Balderston when his position was eliminated as part of a reorganization and RIF of the company. Balderston's own belief that he was the best candidate is irrelevant to the question of pretext. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) (finding that employee's self-interested assessment of her own job abilities is insufficient to raise an issue of fact).

Cockerham's reasons may have been "foolish or trivial or even baseless." *Hartley*, 124 F.3d at 890 (citation omitted); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002) ("employers may terminate competent employees older or otherwise because they do not like them"). However, there has been no showing, other than Balderston's own statements, that Cockerham did not honestly believe his assessment of Balderston. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perception and feelings, are required to support a discrimination claim.").

The reasons for Balderston's termination are not scrutinized as to whether they were right or wrong, but only "whether the reason for which the [employer] discharged the [employee] was discriminatory." *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). Balderston's statement that he secured a $6,000 contract

with the MSC does not refute Cockerham's belief that Balderston should have secured a more valuable contract. Nor does Balderston's statement that he did not personally perform the audit on the Amocar project refute Cockerham's opinion that Balderston held the ultimate responsibility as project supervisor. "[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (citation omitted). Even if it may be true in the present case that Cockerham did not check on the validity of all of his facts and had a mistaken belief, as with the erroneous budget figures, there has been no showing the dismissal was based on illegal discrimination. *See id.* at 677-78. Although Balderston might wish us to review Fairbanks' decision on the merits, "this court does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986); *accord Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). There has been no evidence to show that Cockerham did not honestly believe he was dismissing a poorer performing, less suitable candidate and Fairbanks is therefore not liable for intentional discrimination.

We also find that Martin's comment at the 1996 executive meeting was not sufficient evidence, particularly standing alone as the only statement regarding age as a determining factor, to allow a finding of pretext. A statement of discriminatory animus must be made by a decisionmaker and relate to the action at issue. *Sanghvi v. St. Catherine's Hosp., Inc.*, 258 F.3d 570, 574 (7th Cir. 2001) (citation omitted); *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000) (holding that discriminatory comment must be made by a decisionmaker "(1) around the time of, and (2) in reference to, the adverse employment action complained of"). In the face of all of defendant's evidence

as to legitimate reasons for dismissing Balderston, Martin's statement, made several years prior to the RIF, as the only indication of age discrimination, is insufficient to conclude that Fairbanks' reasons were pretextual.

b. Gabriel

Gabriel maintains that he was discriminated against in favor of Ericson, Desing, and Stull. Although there is no dispute that Gabriel meets the first three elements of his *prima facie* case, he fails to meet the fourth prong with regards to Desing and Stull in showing he was replaced by a similarly situated individual outside the protected class. *McDonnell Douglas*, 411 U.S. at 802.

Gabriel stated that Desing, age 44, and Stull, age 38, were treated more favorably when, as part of the reorganization, they were transferred to the positions of service specialists as part of the technical services group under the marketing department, whereas Gabriel was discharged. The service specialists were to provide technical service information about commercial engines and parts and service for all product lines to both Fairbanks' employees and Fairbanks' customers. Desing and Stull were selected because of their extensive knowledge of the EnviroDesign® engine and its installation and commercial applications, in addition to their ability to supervise and troubleshoot installation of the engine. Gabriel, whose primary focus had been MSC's government account, has not shown that he had experience with the EnviroDesign® engine or more experience with its commercial applications. Therefore, Gabriel was not similarly situated to Desing and Stull.

Viewing the evidence in a light most favorable to Gabriel, the district court found that there was sufficient evidence to meet the fourth prong of Gabriel's *prima facie* case with regard to Ericson. Although we believe the evidence shows that Gabriel and Ericson were not similarly sit-

uated, we agree with the district court's finding that Gabriel failed to show that Connolly's proffered reasons for choosing Ericson were pretextual. *See Burdine*, 450 U.S. at 252-53. Connolly stated that the primary factor in her decision was based on Ericson's experience with one of Fairbanks' largest and most difficult accounts, Avondale. Connolly knew that Avondale was a complex and demanding client and that Ericson, during his many years of working with Avondale, had continually pleased Avondale's management and personnel. On the other hand, Connolly was aware that an Avondale representative had complained about Gabriel's "rude and uncooperative" attitude. Connolly focused on Ericson's extensive and positive working relationship with Avondale. Even Balderston's evaluations support Ericson's skill in working with Avondale. Gabriel has produced no factual evidence that Connolly's decision to appoint Ericson instead of Gabriel was intentional age discrimination. *See Uhl*, 121 F.3d at 1137.

Gabriel also maintained that although he was qualified, he was not considered for the position of a program administrator in the government programs department. The position was offered to Tom Hennis, age 48. The six-year age difference does not rise to the level of a "substantially younger," similarly situated person, as required by the Seventh Circuit in cases where the replacement is not shown to be outside the protected class. *See Hartley*, 124 F.3d at 893.

Summary judgment was properly granted on both Balderston's and Gabriel's claims of age discrimination.

### III.  CONCLUSION

For the above-stated reasons, we AFFIRM the judgment of the district court.

　　　　　　　　　　　　　　　　　　No. 01-1166

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*