In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3812

SUSAN A. KUTTNER,

*Plaintiff-Appellant,*

*v.*

JOHN ZARUBA, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 04290 — **Edmond E. Chang**, *Judge.*

ARGUED MAY 29, 2015 — DECIDED APRIL 14, 2016

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Susan Kuttner was fired from her job
as a DuPage County deputy sheriff after she wore her uni-
form and badge while trying to collect on a loan for a friend.
She sued the sheriff alleging that she was fired because of
her sex. There's no direct evidence of sex discrimination, so
Kuttner's lawyer embarked on a protracted fishing expedi-
tion in search of possible comparators to try to mount a case

under the rubric of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Using an overbroad understanding of "similarly situated" employees, the lawyer sought the personnel files of more than 30 employees of the DuPage County Sheriff's Office. In response to these and other inappropriate discovery requests, the district judge stepped in and imposed some limits. In the end Kuttner failed to adduce evidence of sex discrimination, so the judge entered summary judgment for the sheriff.

On appeal Kuttner argues that the judge unduly restricted discovery and improperly granted summary judgment. We reject these arguments and affirm.

## I. Background

Kuttner began working as a DuPage County deputy sheriff in 1998. In February 2010 she was fired by the Merit Commission, a unit of the sheriff's department that handles hiring, promotions, and disciplinary matters. The Commission was acting on an October 2009 complaint by Sheriff John Zaruba regarding an incident that occurred several months earlier when Kuttner, while in uniform, paid a visit to the home of a person who owed money to her boyfriend. More specifically, Kuttner's boyfriend Steve Cooper had loaned a sum of money to one Reginald Benjamin. Benjamin did not repay the loan. One afternoon in April or May 2009, Kuttner—wearing her official sheriff's uniform and badge—visited Benjamin's home in Hinsdale, Illinois, where he lived with his parents. Benjamin's father came to the door and told Kuttner that his son was not home. Kuttner then left a business card listing her name and a company called "Team in Focus, DC International."

Sheriff Zaruba alleged in his disciplinary complaint that Kuttner's conduct—attempting to collect on a personal loan for a friend while in uniform—violated multiple departmental regulations. In what amounted to a plea deal, Kuttner stipulated to the facts we've just recounted and admitted to violating two rules: one prohibiting "conduct unbecoming" an officer and another prohibiting the improper wearing of the uniform. In exchange the other disciplinary charges were dropped. The Merit Commission determined that Kuttner's conduct was serious enough to warrant discharge. She was fired on February 24, 2010.

Two weeks later Kuttner filed a complaint with the EEOC alleging that the sheriff had discriminated against her on the basis of her sex. After the agency declined action and gave her permission to sue, she brought this lawsuit against Sheriff Zaruba claiming sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2 *et. seq.*[1] The complaint alleged that Kuttner was fired and denied a promotion because of her sex and that the sheriff's policies regarding jail staffing discriminated against female employees.[2]

---

[1] Kuttner also named the "DuPage County Sheriff's Offices" and DuPage County as defendants. The former has no legal existence, and the County is in the suit only by virtue of its duty to pay any judgment against Sheriff Zaruba in his official capacity. We'll refer to Sheriff Zaruba as the sole defendant.

[2] Kuttner also alleged that Sheriff Zaruba retaliated against her for complaining about the jail-staffing policies and breached her employment contract by failing to give her sick-leave and adoption benefits after she was fired. The district court dismissed these claims as baseless, and Kuttner does not challenge those rulings.

Discovery did not go smoothly. Lacking any direct evidence of discrimination, Kuttner's attorney cast a very wide discovery net in an effort to turn up male deputies who faced similar misconduct charges but suffered less drastic employment consequences. Among other things, Kuttner's lawyer sought the entire personnel files of more than 30 employees of the Sheriff's Office—including, baselessly, documents relating to Sheriff Zaruba's wife. The sheriff objected, and when the parties couldn't resolve the dispute, they sought the court's assistance. Prompted by the judge, Kuttner's lawyer admitted that his request for documents about the sheriff's wife's file was just "a fishing expedition." Following a hearing, the judge concluded that Kuttner's discovery requests were overly broad and unduly burdensome because they lacked any time limitation and were based on "an overbroad definition of 'similarity' of misconduct." The judge curtailed the scope of discoverable personnel documents to those arising after January 1, 2006, and pertaining to employees who were alleged to have engaged in "similar misconduct as [Kuttner] (abuse of authority) or sufficiently serious misconduct." In addition to issuing these general limitations, the judge resolved some specific disputes about the disclosure of personnel files of particular employees.

Discovery proceeded for several months under these restrictions. More than three months later, however, Kuttner moved for reconsideration. The judge was not impressed with the belated motion, which came just a few weeks before the deadline to complete discovery (already twice extended). The judge reiterated his view that "[f]rom the start of discovery, Plaintiff (actually, her counsel) has made overly

broad and unduly burdensome discovery requests, some of which were unwarranted fishing expeditions bordering on harassment." As the judge saw it, Kuttner's counsel was again "over-reaching" and had shown "no solid factual basis for believing" that relevant evidence would be uncovered if the discovery restrictions were lifted. The judge declined to revisit his earlier order.

It was not long before Kuttner's lawyer again butted heads with the judge—this time during the next-to-last round of depositions. Deposing Deputy Tara Campbell, Kuttner's counsel asked the witness whether she had ever heard or seen *any* deputy violate *any* Sheriff's Office policy or procedure. Predictably, this expansive inquiry drew an objection, and a call to the judge's chambers followed. The judge had twice sustained objections to similarly overbroad inquiries by Kuttner's counsel earlier in this contentious discovery process. The judge did so again and restricted the inquiry to questions about the witness's "personal knowledge of abuse of authority committed by other deputies (*i.e.*, no more hearsay in the hope of leading to admissible evidence concerning abuse of authority)."

After discovery closed Sheriff Zaruba moved for summary judgment. Kuttner responded by proffering four male comparators that she claimed had also abused their positions but were not fired. The judge rejected all four because their misconduct was too dissimilar to make them suitable for comparison under the *McDonnell Douglas* indirect method of proof. Kuttner offered no other evidence that she was fired because of her sex, so the judge entered summary judgment for the sheriff on this claim. The judge also rejected Kuttner's failure-to-promote claim because she had never

sought a promotion, nor had she alleged that a less qualified male employee was promoted over her within the 300-day limitations period. Finally, the judge concluded that material factual disputes necessitated a trial on Kuttner's claim about the sheriff's jail-staffing policies.

A different judge presided at trial. Sheriff Zaruba prevailed.

## II. Discussion

Kuttner apparently accepts the outcome of the trial; on appeal she does not seek to revive her jail-staffing claim. Rather, she challenges only the judge's discovery limitations and his summary-judgment rulings rejecting her claims that she was fired and denied a promotion because of her sex.

### A. Discovery Limitations

District judges have broad discretion over discovery matters, so we review discovery rulings deferentially, only for abuse of discretion. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014). This standard requires us to affirm unless the judge's ruling lacks a basis in law or fact or clearly appears to be arbitrary. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 644 (7th Cir. 2011). If we do find an abuse of discretion, "we will not grant any relief 'absent a clear showing that the denial of discovery resulted in actual and substantial prejudice.'" *Id.* (quoting *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995)).

Kuttner argues that the judge's temporal limitation on discovery—the January 1, 2006 outer boundary for personnel records—was arbitrary. *Any* temporal limit on discovery is in some sense artificial, and it's true that the January 1, 2006

date isn't keyed to any specific facts in the case. But our abuse-of-discretion standard of review requires a deferential and contextualized approach. To that end, the proper inquiry in this case is two-fold: (1) was *some* time limit warranted here, and (2) was *this* time limit reasonable, i.e., did it allow Kuttner a meaningful opportunity for discovery? The answer to both questions is "yes."

To the first question, the judge's reason for imposing the time limit was to rein in Kuttner's "overly broad and unduly burdensome" discovery expedition, perhaps exemplified most starkly by the request for the personnel records of Sheriff Zaruba's wife, who could not possibly have served as a legitimate comparator and was presumably targeted solely for harassment and humiliation. The judge reasonably concluded that this litigation conduct by Kuttner's counsel justified placing some limits on discovery so that it would focus only on capturing information reasonably calculated to lead to relevant evidence.

Recency is one component of relevance. Valid comparators for a plaintiff proceeding under the *McDonnell Douglas* indirect method of proof are "employees [who] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000). Here, restricting the time period wasn't just about preempting a fishing expedition; it also served to hone in on possible comparators who were reasonably likely to have been subject to the same rules, supervisors, and decision-making process as Kuttner. *Cf. Balderston v. Fairbanks Morse Engine*

*Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003) (affirming the district court's restriction of discovery in an ADEA case to only those employees who, *inter alia*, "obtained [their] desired positions around the same time" as the particular round of workforce reduction affecting the plaintiff).

We're confident as well that the authorized window was adequate for Kuttner to engage in meaningful discovery. Kuttner doesn't attack the judge's original order limiting discovery; rather, she takes aim at the denial of her reconsideration motion. Recall that more than three months elapsed between the original order and Kuttner's reconsideration motion. While this delay is not dispositive, there's no question that it threatened to impose a massive new burden on the defendants with only a few weeks remaining until the discovery cutoff. Indeed, the judge relied on the delay as one reason for declining to reopen the matter. That was clearly a valid consideration.

The judge also noted that the discovery deadline had already been extended several times, yet Kuttner had "fail[ed] to advance the actually-authorized discovery so far." Kuttner can't complain that she was hamstrung by the temporal limitation when she didn't make an adequate or appropriate effort to exhaust the avenues that were left open to her under the court's earlier orders.[3]

_____

[3] Our dissenting colleague faults us for relying in part on the burdens created by Kuttner's tardy reconsideration motion. *See* Dissent at p. 18. As we've noted, however, Kuttner's attorney waited three months before asking the judge to reconsider the discovery limitations, and he filed his reconsideration motion only a few weeks before the discovery deadline, which had already been extended several times. It was not unreasonable for the judge to take the delay into account and also to consider the

Finally, Kuttner points to the fact that the judge who presided at trial "allowed testimony and evidence on all matters, including those between 1998 and 2006." But the issue at trial was whether the sheriff's policies governing jail staffing were discriminatory. That claim rested on an entirely different evidentiary basis than Kuttner's claim that she was fired because of her sex. The scope of the evidence at trial is irrelevant here.

Kuttner also complains about the court's directive prohibiting "any hearsay questions during depositions." But this mischaracterizes the judge's ruling. During Deputy Campbell's deposition, Kuttner's counsel asked the witness whether she had ever heard or seen *any* deputy violate *any* departmental policy or rule. That question was obviously overbroad; the judge had previously ruled similar questions out of bounds (twice!) and did so again when he was called during Deputy Campbell's deposition. To curtail further abuses, the judge directed Kuttner's counsel to stick to questions about the witness's "personal knowledge of abuse of authority committed by other deputies (*i.e.*, no more hearsay in the hope of leading to admissible evidence concerning abuse of authority)." Understood in proper context, this wasn't a ban on "any hearsay questions," as Kuttner now contends.

In short, the judge's discovery limitations were entirely reasonable responses to the litigation conduct of Kuttner's counsel. We find no abuse of discretion.

---

burdens that would necessarily flow from opening eight additional years of personnel records to discovery so late in the litigation.

**B. Summary Judgment**

We review the judge's summary-judgment ruling de novo, giving Kuttner the benefit of all reasonable inferences. *Huang v. Cont'l Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014). Kuttner never specifically articulated which evidentiary path she was pursuing to support her claims that she was fired and denied a promotion on account of her sex. It's clear, however, that she has no direct proof of discrimination. *See Collins v. Am. Red Cross*, 715 F.3d 994, 999 (7th Cir. 2013) (The "direct" method of proof requires that the plaintiff "provide either direct or circumstantial evidence that the employer had a discriminatory motivation."). The default method of proving discrimination is the burden-shifting approach of *McDonnell Douglas*, which requires the plaintiff to first make a prima facie showing that "(1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

The district judge concluded that Kuttner failed to satisfy the prima facie requirements because she did not identify any similarly situated male employee who received more favorable treatment. That conclusion was sound. Kuttner proposed four comparators—Richard Morgan, Philip Lynch, Joseph Zbilski, and Edmund Moore—but their misconduct wasn't similar enough to Kuttner's to make them suitable for comparison under the indirect method of proof.

Deputy Morgan received a written reprimand for making two personal visits to a female inmate in the jail while in uniform. Sergeant Lynch and Deputy Zbilski both distribut-

ed expired commissary food to an indigent female inmate; Lynch was instructed by a supervisor to discontinue the practice, but no discipline followed for either officer. Sergeant Moore held night employment as a bouncer at a bar; he was issued a written reprimand and instructed to quit his second job.

On appeal Kuttner points to additional alleged misconduct by Morgan, Zbilski, and Moore. She says that Deputy Morgan allowed his girlfriend to dress up in his uniform for Halloween; for this he was referred to the Merit Commission, but he was not fired. Kuttner also claims that Deputy Zbilski hired an ineligible inmate to operate the commissary, but no charges were ever brought for this misconduct. Finally, she says that Deputy Moore had a romantic relationship with a domestic-violence victim but was not referred to the Merit Commission or otherwise reprimanded.

Kuttner's prima facie case requires a showing of *sufficiently analogous* misconduct by male officers to support an inference that she was treated more harshly because of her sex. As the district judge correctly noted, the gravamen of the misconduct for which Kuttner was fired was "us[ing her] uniform to convey the impression that [she] was acting on the authority of the Sheriff's Office, but was not." It's not just that Kuttner wore her uniform while off duty or even for unofficial purposes; the material point is *how* the uniform was being used—for the improper projection of coercive police authority in service of a personal end. That's what differentiates Kuttner's misconduct from, for example, Deputy Morgan's allowing his girlfriend to wear his uniform to a Halloween party or making two personal visits to a female inmate in the jail. In Deputy Morgan's case, there

were no allegations of coercion by the use or appearance of legal authority.

The remaining instances of misconduct by the male comparators are not remotely analogous to Kuttner's coercive misuse of her uniform. Probably the closest call is Sergeant Moore's night employment providing security at a bar. But he was not accused of wearing his uniform at this second job, so there was no improper coercion.

Summary judgment is appropriate when the distinctions between the plaintiff and the proposed comparators "are so significant that they render the comparison effectively useless." *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). That is the case here. The judge correctly granted summary judgment for the sheriff on Kuttner's claim that she was fired because of her sex.

Finally, Kuttner argues that her failure-to-promote claim should have survived the summary-judgment motion. We don't see how; she never applied for a promotion, nor did she allege that a less qualified male officer was promoted over her during the 300-day limitations period preceding her complaint. Rather than contesting this line of reasoning directly, Kuttner shifts gears and argues that she "may establish a prima facie case using statistical evidence instead of comparative evidence pertaining to each class member." There are two glaring problems with this argument: This isn't a class action, and Kuttner hasn't adduced a shred of statistical evidence to support the claim.

AFFIRMED.

POSNER, *Circuit Judge*, dissenting. The plaintiff, a former deputy sheriff of DuPage County, Illinois, charges the sheriff with having filed a complaint with the Sheriff's Merit Commission that led the Commission to fire the plaintiff for an offense that was almost always less serious, rarely as serious, and never more serious than offenses committed by male deputy sheriffs that elicited either no punishment or a slap on the wrist. If the plaintiff could prove these allegations she would be well on her way to proving sex discrimination in violation of Title VII of the Civil Rights Act of 1964. She was prevented from proving them by an arbitrary discovery cut-off date of January 1, 2006, imposed by the district judge. (Other allegations that she made were properly rejected by the district court, however.)

She was fired for violating two departmental regulations: "Conduct Unbecoming," and "Wearing of the Uniform" when not on duty. Knowing that her partner in a real estate brokerage business had lent money that had not been repaid when due, she went to the borrower's home dressed at least partially in uniform (a potentially significant qualification ignored in the majority opinion, as by the district judge— one would like to know whether she was wearing enough of her deputy sheriff's uniform to appear to be on duty). Upon learning that he was not at home, she left a business card in the names of "Susan A. McKinley" and "Team in Focus, DC International," names she uses in her off-duty business activities. She had no financial interest in the repayment of the loan, which was unrelated to the partnership.

The Commission's decision to fire her was based not just on the incident just described but also on her failing to notify the sheriff's department that she had engaged in off-duty

business activity while in uniform, though this may have been a common practice of other deputy sheriffs who engage, as a number appear to do, in off-duty business activities. The majority opinion's description of her wearing her uniform (or part of it) off duty as "the improper projection of coercive police authority" and "coercive misuse of her uniform" is, however, unsubstantiated. The borrower whom she tried to visit was not at home, and so he didn't see her in uniform. His father opened the door to her and told her that his son wasn't at home, but he has not complained that he felt intimidated by her visiting in uniform. (For all we know, father and son knew she was a police officer and expected her to be wearing a uniform.) If a police officer drops into Starbucks in uniform, the uniform does not intimidate the barista. So far as appears, *no one* has complained of being intimidated by the plaintiff. There is no suggestion that she ever revisited the borrower's home.

She'd been hired by the sheriff's department in 1998; she filed this suit in 2010. Because of the January 1, 2006, discovery cut-off date, she was unable to conduct discovery regarding a series of suspected offenses by male sheriff's deputies committed between her hiring date and the end of 2005. She listed 21 suspected offenses that she believed had been committed by male deputies during that period, including a uniformed officer's having sex in his squad car with the wife of a man whom the officer had arrested for domestic battery (she was the victim of the battery); an officer's dressing his girlfriend in his uniform and parading her in a bar, where the couple was seen by other officers who had been summoned because a fight had broken out; an officer who groped and harassed a teenage girl whose mother complained to no avail, and who, while in uniform, re-

fused to pay the full price of or the tax on an item on the ground that he was a sheriff's deputy, and who hired a prostitute for himself and his wife, refused to pay her, and arrested her when she kept insisting on being paid; an officer, again in uniform, who demanded a "police price discount" and launched an investigation to determine whether a hot dog that had made him ill had been deliberately tampered with because he was an officer; an officer arrested for driving under the influence; an officer who in and out of uniform repeatedly beat up his girlfriends and was arrested twice for driving under the influence and on one of those occasions was found to have cocaine in his car; an officer who while in uniform frequented a massage parlor suspected of being a brothel and who when he discovered that the sheriff's office was beginning to investigate the parlor is believed to have tipped it off; an officer repeatedly accused of sexual harassment and caught viewing pornography on a county computer while on duty and in uniform; another officer who was the subject of repeated complaints of sexual harassment; an officer who dated a female deputy sheriff who accused him of having broken into her apartment after they broke up and having on that occasion masturbated on the pillow of her bed, all while in uniform; an officer who while in uniform hired an ineligible inmate who happened to be a friend of the officer's family to operate the commissary in the sheriff's office; an officer who was caught on a videotape stealing from a record store—in uniform.

I'll spare the reader the other 10 alleged incidents. In none of the 21 incidents were the perpetrators fired and many were later promoted. Yet every one of the incidents, if they were as described in the plaintiff's allegations—and it's hard to imagine them as sheer fabrications—were either as

serious as, or (more often) considerably more serious than, the plaintiff's visit to the home of her partner's debtor. Indeed, since the person she was trying to visit was not at home, he can't have been intimidated by her uniform (unless perhaps his father was—of which there is no indication). Although the other ground of her being fired was wearing her uniform while engaged in business activities, there is no indication that her wearing the uniform *ever* intimidated *anyone*.

I don't see how the judges in the majority can say with straight faces that the plaintiff "did not identify any similarly situated male employee who received more favorable treatment." She identified more than 21 such favored males (for some of the incidents involved more than one officer). Granted, these were accusations (though given what we know of police behavior, not unbelievable ones), but she was given no opportunity to prove them. I also don't see the relevance of the majority opinion's saying, about the deputy sheriff who hired an ineligible inmate to operate the sheriff's office commissary, that "no charges were ever brought for this misconduct"—as if failure to bring charges excused, rather than exacerbated, the misconduct.

The plaintiff's lawyer was prevented from trying to establish the truth of the accusations against the male deputy sheriffs because he was barred by the January 1, 2006, cut-off date from conducting *any* discovery relating to the incidents in question, all of which had occurred before that date. He wasn't even allowed to conduct discovery of just the most egregious violations by the male deputy sheriffs, violations that despite their egregiousness had led to no one's being fired and few being punished in any way. At oral argument I

asked the sheriff's lawyer whether there had been any changes in the department's disciplinary standards or procedures, effective at the beginning of 2006, that might have made the earlier incidents ancient history; for had the sheriff's office cleaned up its act by January 1 of that year the discovery limit would have been defensible. He replied that there had been no such changes. The majority opinion misses this point when it says that the cut-off date "served to hone in on possible comparators [awful word] who were reasonably likely to have been subject to the same rules, supervisors, and decision-making process as" the plaintiff. There is, to repeat, no evidence of a change of rules, supervisors, or the department's decision-making process in 2006.

The majority opinion approves the January 1, 2006, cut-off date for discovery but gives no reason for its approval, though the logical cut-off date would have been when the plaintiff was hired in 1998. The cut-off date imposed by the district judge and now ratified by this court killed the plaintiff's case because she was able to identify only four incidents of misconduct by male sheriff's deputies in the four years after the cut-off date, none of which was comparable to her misconduct, compared to the 21 incidents that she had learned about that had occurred in the eight preceding years (1998–2006). Those incidents, summarized earlier in this opinion, involved worse misconduct than hers—indeed there's no indication that the plaintiff's misconduct caused harm to anyone or even minor embarrassment to the sheriff's department.

Had the department cleaned up its act by 2006, the judge would have been right to exclude evidence pertaining to earlier misconduct, because the incident that appears to have

triggered the plaintiff's discharge—the visit to the home of the person who owed her partner money—came later. But, to repeat, the sheriff's lawyer acknowledged that nothing had changed in 2006, and so there was no reason to ignore the earlier misconduct, which was the critical evidence of discriminatory treatment of the plaintiff. The majority opinion concedes that the "January 1, 2006 [cut-off] date isn't keyed to any specific facts in the case." Very odd is the further statement that granting the plaintiff's motion to reconsider the cut-off date "threatened to impose a massive new burden on the defendants with only a few weeks remaining until the discovery cutoff." If the department needed more time, the judge could have extended the cut-off date. In the unlikely event that discovery regarding all 21 incidents would have placed a crushing burden on the sheriff's office (more likely it would have led the office to clean out the Augean stables at last), the judge could have limited the discovery, at least to begin with, to the most serious of the 21 incidents.

One of the pre-2006 incidents that the plaintiff wanted to explore involved the officer who had dressed his girlfriend in his uniform and paraded her in a bar. His only post-cut-off offense (2008), or at least the only offense of which he was accused, was making personal visits to a female detainee in the county jail, in uniform of course. For this misconduct he was issued a written reprimand, even though the misconduct was styled "abuse of position." It is hard to square his written reprimand with the plaintiff's being fired for a less serious offense, especially since he was a recidivist and she a first offender, who could expect to be treated more leniently. As for the three other incidents of misbehavior by male deputy sheriffs after the 2006 cut-off date, one led to a

written reprimand, another to no disciplinary action, and the third to a mere admonition to the deputy sheriff to desist from repeating the infractions.

The arbitrary discovery cut-off date was the district court's worst mistake, but there were two other serious mistakes as well, both ignored in the majority opinion. One was to base the cut-off date on annoyance at what the judge deemed abuses by the plaintiff's lawyer—and there were a few, such as asking to see the personnel file of the sheriff's wife. But the proper response to those abuses would have been to order the lawyer to shape up, and if necessary to fine him for his contumacy; the tight cut-off date arbitrarily punished his client. Second, the judge refused to allow the lawyer to ask any questions intended to elicit hearsay testimony. The lawyer wanted to ask members of the sheriff's department whether they'd heard mention of misconduct committed by other members. An answer to such a question would be hearsay. But as the district judge seems to have overlooked, the version of Fed. R. Civ. P. 26 in force during the district court proceedings permitted hearsay in discovery if it held reasonable prospects of leading to admissible evidence. See Fed. R. Civ. P. 26(b)(1) (the rule was changed effective December 1, 2015, but final judgment in the district court in the present case had been entered on December 4, 2014, and anyway the new rule provides that "discovery need not be admissible in evidence to be discoverable"); *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 930 (7th Cir. 2004); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350–51 (1978). Given the difficulty of discovering misconduct that does not give rise to a written report, the judge should have allowed inquiry into the knowledge possessed

by witnesses concerning possible misconduct by sheriff's deputies.

The combination of the arbitrary cut-off date and the discovery hearsay bar was fatal to a promising case of disparate treatment based on gender. And "promising" is an understatement. It is a virtual certainty that the plaintiff was disciplined far more harshly than male counterparts who engaged in far more egregious conduct—far more harshly because she's a woman. The DuPage County Sheriff's Office is or at least was a boy's club.

We should be reversing and remanding to permit further discovery, not affirming.