**Gary T. ST. LOUIS, Plaintiff,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin Insurance Corporation, Defendant.**

No. 02–C–581–C.

United States District Court, W.D. Wisconsin.

Dec. 23, 2003.

David E. Lasker, for Plaintiff.

Earl H. Munson, Boardman, Suhr, Curry & Field, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief, brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 623–634. Plaintiff Gary T. St. Louis contends that defendant American Family Mutual Insurance Company discriminated against him when, after a company reorganization, it failed to offer him an interview for a tier II

position with approximately the same salary as his former position. Subject matter jurisdiction is present under 28 U.S.C. § 1331.

Presently before the court is defendant's motion for summary judgment. Defendant denies that it discriminated against plaintiff when it refused to interview him for tier II positions, asserting that it denied him interviews because his skills and background did not match the needs of those positions and were better suited for lower level tier III positions.

Plaintiff has not adduced sufficient evidence to show that he was similarly situated to substantially younger interviewees or that defendant's reasons for not offering him an interview for tier II positions were dishonest. No reasonable jury could infer from the evidence he has adduced that defendant had discriminatory animus under either the direct and indirect method of showing intentional age discrimination. Therefore, I will grant defendant's motion for summary judgment.

From the proposed findings of fact and the record, I find that the following facts are material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Gary T. St. Louis is a Wisconsin resident currently employed at General Casualty Company of Wisconsin, Inc., as one of three personal lines territory managers in the state. His birth date is September 23, 1946. At the time of the events in this case, plaintiff was 54 years old and employed by defendant American Family Mutual Insurance Company as one of 14 senior underwriting specialists in the company's Personal Lines division. Plaintiff is a chartered property casualty underwriter. He is the former president of the Dairyland Chapter of the Society of Chartered Property Casualty Underwriters.

Defendant is a mutual insurance company with its national headquarters located at 6000 American Parkway, Madison, Wisconsin. At the time of the events in this case, defendant had 14 divisions. With approximately 650 employees, Personal Lines was the third largest division in the company. It handled homeowners' insurance, automobile insurance, boat owners' insurance and personal umbrella insurance. Jack Salzwedel was the vice president of the division.

### B. *Plaintiff's Work History with Defendant*

Defendant first employed plaintiff as an underwriter on June 12, 1972. From 1982 until 1991, plaintiff held the position of corporate training manager. At one point while holding that position, plaintiff supervised approximately 10 employees. In October 1991, plaintiff became a senior underwriting analyst after arranging a transfer from the corporate training department to the underwriting staff. From October 1991 until August 2000, plaintiff reported to James Schwartz, director of underwriting for property lines. During the entire time that plaintiff worked as an underwriter for the property lines division, his duties included drafting and filing forms, developing rules and procedures, training and working as a technical liaison with regional staff and creating policies and endorsements that were necessary to satisfy a particular need in the marketplace. As an underwriter, plaintiff did not supervise employees and no one reported to him. Schwartz often complimented plaintiff on his written communication skills and gave plaintiff favorable performance assessments.

In August 2000, Joseph Zwettler replaced Schwartz as plaintiff's supervisor after Schwartz retired. Zwettler was one of 11 directors who reported to Salzwedel.

Plaintiff and Zwettler had a good relationship.

Around the same time that Zwettler started working with plaintiff, defendant rolled out a boat insurance policy rewrite project, on which plaintiff had been working as the project lead. The goal of the project was to streamline the application, keeping it to one side of one page, which plaintiff had accomplished. Both Schwartz and Zwettler signed a note on June 12, 2000, acknowledging plaintiff's "good job" on the boat project.

However, after defendant rolled out the boat insurance policy rewrite to agents in the field, Zwettler had concerns about it, particularly about coverage of boat hoists. Zwettler talked with plaintiff about the concerns some field agents had expressed about the boat rewrite policy, but nothing was done immediately. Salzwedel had questions about the boat policy rewrite and discussed the topic with Zwettler. Zwettler was frustrated that he had to revisit the issue three times before plaintiff modified the policy. Salzwedel stated that he was not sure whether the field was "ever really happy with the [boat] policy [rewrite]." Plaintiff was not aware of any concerns about the boat insurance policy rewrite expressed by operations managers. In addition, defendant never told plaintiff about any complaints from operations managers regarding issues arising from projects on which plaintiff worked.

During plaintiff's tenure with defendant, he worked long hours and was active in the company and the community. Over the years, plaintiff's supervisors gave him positive performance assessments, including positive comments from Schwartz about his performance on the boat owners rewrite project. Defendant's executives and managers praised plaintiff for his contribution to the company and community. Defendant provided plaintiff with performance assessments with overall favorable comments on May 8, 1992, June 1, 1993, July 27, 1994, September 1, 1995, October 14, 1996, November 19, 1997, and June 7, 2000.

## C. Zwettler's Evaluation of Plaintiff

On April 16, 2001, Zwettler conducted a performance assessment of plaintiff. The assessment occurred eight months after plaintiff's previous assessment, rather than the usual 12 months, and shortly before the announcement of a reorganization plan for the Personal Lines division. Zwettler conducted performance assessments before the reorganization on all employees he did not hire.

Overall, plaintiff's performance evaluation was positive, showing that plaintiff either met or exceeded his primary job responsibilities. The assessment had three negative comments about plaintiff on matters about which plaintiff's former supervisor, Schwartz, had not complained. For example, as to plaintiff's communications skills, Zwettler wrote in the April 2001 assessment that:

Gary has effective communication skills but sometimes needs to take more time to listen to others who may have valuable input that could contribute to helping the Division reach its overall goals. Finding the most positive words to express ideas in written communication would also be useful.

Regarding plaintiff's ability to determine and direct departments involved for program development and problem resolutions, Zwettler wrote:

Gary has good working relationships with many functions and employees but, in an effort to complete projects on time, he will sometimes not consider all the steps needed to make sure everyone is on board.

Finally, regarding plaintiff's ability to serve as a technical resource for other divisions, Zwettler wrote:

Gary's intent is to fully support the new direction in Personal Lines but has to raise his awareness of the need and value of input from others within and outside the Division as Divisional changes are implemented.

Zwettler admitted that the negative comments in plaintiff's performance assessment were "not really bad" and that the comments merely reflected things plaintiff "could work on." Zwettler had "just a general sense" that defendant's operations managers perceived plaintiff to have communication problems. When plaintiff asked Zwettler to provide examples to support the negative comments in the April 2001 performance assessment, Zwettler was unable to provide such examples. Zwettler found plaintiff to be talented, a hard worker who put in extra hours and good at focusing on specific questions. Zwettler approved plaintiff for the highest raise possible for a senior underwriting specialist, amounting to an annual salary of $83,300, only $200 below the $83,500 maximum for that position.

### D. *Personal Lines Reorganization*

In May 2001, Salzwedel, vice president of Personal Lines, and the directors for Personal Lines planned a restructuring of the division to balance profit and growth and to improve rate-making and product design. At no time during the planning stage of the reorganization did anyone discuss linking the reorganization to the age of the workforce. The overall salary in Personal Lines was greater after the reorganization than before it. However, defendant filled some positions with younger employees who were closer to the lower end of the salary range. Salzwedel believes that there were no more than ten Personal Lines employees that did not get employment after the reorganization.

The reorganization effort focused on manager, consultant and specialist level jobs and did not affect base line employees who worked most closely with individual policies. Defendant required affected employees to reapply for employment under the new structure because their former jobs no longer existed.

The reorganization resulted in the following types of positions: 1) tier I, director positions; 2) tier II, management and consultant positions; and 3) tier III, specialist and analyst positions. The tier II positions had pay similar to the salary that plaintiff had earned as a senior underwriting specialist. The reorganization reduced the number of director positions from 11 to seven, but overall Zwettler believed that the reorganization resulted in more high-level jobs. Zwettler thought the reorganization created two fundamental positions: a subject matter expert and a management position that could lead big projects and communicate effectively.

Defendant's human resources division set the salary levels for the new positions using the Hay Group job evaluation system and market research; until human resources staff determined the salary ranges, Personal Lines management had no idea what salary ranges would be assigned to the new positions. At no time during the pricing of the various positions was there any reference to the age of any employee or of the workforce or to a reduction in the overall payroll in the division. Human resources determined salary ranges for the tier II positions in late May or early June and for the tier III positions in June and July 2001. Upon learning the salary ranges, Zwettler expressed concern about the salary level to the human resources department, but its response was that the market established those salary ranges. Human resources promised to re-

evaluate some of the salary levels within a year.

Plaintiff learned of the reorganization at a meeting on July 17, 2001. He viewed the reorganization as a positive step. Zwettler knew that plaintiff supported the reorganization. Defendant gave plaintiff a handout notifying employees to submit a "job preference form," indicating their strengths and weaknesses. Defendant planned on filling most Personal Lines jobs by October 31, 2001. If an employee applied for a tier II position but was not hired, the employee could apply for a tier III or other Personal Lines position.

On July 24, 2001, plaintiff submitted a job preference form, applying for the following tier II positions: 1) product design manager; 2) product design consultant; 3) system design consultant; and 4) profit and growth consultant, Great Lakes/Valley Region. Plaintiff did not apply for any tier III positions because of the pay scale. Under the tier III positions, plaintiff's salary would have been reduced by $20,000 over a two-year period.

1. *Product design positions*

Zwettler was in charge of hiring the product design manager and product design consultant positions. In conjunction with Scott Wilde in human resources, he decided not to interview plaintiff for either the consultant or manager position. Zwettler believed that both positions required strong communication skills and the ability to elicit input from others. He believed that plaintiff met the minimum technical qualifications for the positions.

Thirty-one persons applied for the product design consultant positions. Eighteen were interviewed and eight were selected. Of those interviewed for the product design consultant position, six (33%) were ten or more years younger than plaintiff. Of the eight people selected, one person (13%) was ten or more years younger than plaintiff and two were older than plaintiff.

The product design manager position required 1) strong leadership ability; 2) strong knowledge of property/casualty products, competitors and trends; 3) a chartered property casualty underwriter designation; 4) a bachelor's degree or equivalent; 5) five or more years of broad experience in personal lines including underwriting, sales, risk management, product development or compliance; and 6) management experience. Nine people applied for the product design manager position. Of those who applied, Zwettler selected four for an interview and hired one. Of those interviewed, one (25%) was ten or more years younger than plaintiff and one was older. The person hired, Tim Johnston, was ten or more years younger than plaintiff.

2. *System design consultant*

Maryelyn Geisler was the hiring director for the system design consultant position. She was familiar with plaintiff because she had relied on him before as a subject matter expert on underwriting issues. She and plaintiff had a good working relationship. She had never complained to plaintiff directly about any problems.

Geisler worked with Wilde to determine possible interviewees for the system design consultant positions. They reviewed the candidates job preference forms, their recent performance assessments and their skills. Geisler believed that the ability to manage large projects and pull together diverse groups of people were critical skills for these positions. She granted interviews to 18 people of the 28 applicants for the system design positions and selected seven. Of the 18 persons interviewed, nine (50%) were ten or more years younger than plaintiff. Two interviewees were older than plaintiff. Of the seven people

Geisler selected for the positions, three (43%) were ten or more years younger than plaintiff and one was older than plaintiff.

Geisler did not grant plaintiff an interview because plaintiff's job preference form showed that he preferred product design positions over system design positions and because Geisler believed plaintiff lacked sufficient communication skills and experience in computer system design or operations. (Plaintiff disputes the accuracy of Geisler's belief concerning his skills and performance.) Plaintiff did not have an extensive background in computer systems.

### 3. *Profit and growth consultant*

Steve Thedinga was the hiring director for the profit and growth consultant positions. The profit and growth consultant positions required excellent communication skills and the ability to work with Personal Lines staff, agents sales managers and sales directors. Plaintiff and Thedinga had interacted with one another on previous occasions.

Thedinga and Alex Arriola of human resources reviewed each of the 23 candidates' recent performance assessments and experience related to the position. Thedinga interviewed 13 of the 23 applicants and selected four. Six of the thirteen interviewed (46%) were ten or more years younger than plaintiff. Of the four people selected, two (50%) were ten or more years younger than plaintiff. None of the selected candidates were older than plaintiff. Thedinga elected not to interview plaintiff and concluded that plaintiff's written and verbal skills were "very average."

### E. *Plaintiff's Resignation*

In early August 2001, a human resources staff member told plaintiff that he was not selected for an interview for any of the positions to which he applied because his skills and background did not match up with those positions. Zwettler encouraged plaintiff to apply for tier III jobs, particularly the product design specialist position, because plaintiff was qualified for those positions. Zwettler thought plaintiff was excellent at focusing on a specific task, being "the expert" and following up on research.

When plaintiff asked Zwettler why he was not offered an interview for any of the positions to which he applied, Zwettler responded that "it was a gut feeling" that led to the decision. Salzwedel stated that plaintiff did not receive an interview for any of the jobs because Zwettler raised some issues of job performance.

Plaintiff declined to apply for tier III positions because of the $20,000 reduction in pay and instead applied to General Casualty, using Schwartz as a reference. Schwartz had nothing but positive comments to give General Casualty about plaintiff. General Casualty offered plaintiff a position on September 1, 2001, that plaintiff accepted one week later.

## OPINION

■ The Age Discrimination in Employment Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. However, the Age Discrimination in Employment Act does not require preferential treatment of older workers. *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 615 (7th Cir.2000) (ADEA does not require employer to terminate younger employees in order to open positions for older workers); *Cerutti v. BASF Corporation*, 349 F.3d 1055, 1062 (7th Cir.2003) (citing *Mullin v. Raytheon Co.*, 164 F.3d 696, 703 (1st Cir.

1999)) ("The ADEA was not intended to protect older workers from the often harsh economic realities of common business decisions and the hardships associated with corporate reorganizations, downsizing, plant closings and relocations.").

Plaintiff contends that defendant violated the Age Discrimination in Employment Act when it refused to offer or interview him for a tier II position. Although plaintiff could have applied for a tier III position, he argues that doing so would have been a demotion because tier III positions paid $20,000 less than his $83,300 salary.

Plaintiff argues that when deciding motions for summary judgment in employment discrimination cases, an "added rigor" standard applies. Plt.'s Br., dkt. # 30, at 2. For support, plaintiff cites *Alexander v. Wisconsin Department of Health and Family Services*, 263 F.3d 673, 681 (7th Cir.2001), in which the court stated that the summary judgment standard "is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." Plaintiff is incorrect to assume that employment discrimination cases require a more stringent summary judgment standard. In *Alexander*, the court explained that use of the phrase "added rigor" in employment discrimination cases does not affect the standard a court uses to review a grant of summary judgment. *Id.* ("Although it is understandable how one might infer from our regular use of this phrase that we meant to communicate a more stringent standard to be used in reviewing employment cases, the original use of this phrase indicates that it was merely included to stress the fact that employment discrimination cases typically involve questions of intent and credibility, issues not appropriate for this court to decide on a review of a grant of summary judgment.").

I will review defendant's motion for summary judgment as I would in any other type of case, construing facts and drawing inferences in the manner most favorable to the nonmoving party. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984–85 (7th Cir.1999). I will grant defendant's motion only if there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1230 (7th Cir.1994); *Hayden v. La–Z–Boy Chair Co.*, 9 F.3d 617, 618 (7th Cir.1993) (summary judgment may be awarded against non-moving party only if court concludes that reasonable jury could not find for that party).

A plaintiff in an age discrimination case may prove his claim in two ways: 1) the direct method, in which he offers either direct or circumstantial evidence to raise a genuine issue of material fact; or 2) the indirect method, also referred to as the *McDonnell Douglas* burden-shifting method. *See Radue*, 219 F.3d at 616–17; *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 889 (7th Cir.1997). Plaintiff attempts to defeat defendant's motion with circumstantial evidence that is applicable under both the direct and indirect method of proving age discrimination. I will address each of these methods in turn, as well as plaintiff's claim of constructive discharge.

### A. The Direct Method

Under the direct method, a plaintiff may present either direct or circumstantial evidence. *Radue*, 219 F.3d at 616. "Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Id.* (citing *Troupe v. May Department Stores, Co.*, 20 F.3d 734, 736 (7th Cir.1994)); *see also Lim v. Trustees of Indiana Universi-*

*ty*, 297 F.3d 575, 580 (7th Cir.2002) ("[D]irect evidence should prove the particular fact in question without reliance upon inference or presumption."). Plaintiff offers no direct evidence that defendant refused to interview him because of his age, so he must rely on circumstantial evidence.

 Circumstantial evidence provides the basis for an inference of intentional discrimination. *Troupe*, 20 F.3d at 736. The Court of Appeals for the Seventh Circuit has identified three different types of circumstantial evidence that may show intentional discrimination. *Id.* at 736. "The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type is evidence, "whether or not rigorously statistical," which shows the systematically better treatment of employees similarly situated to the plaintiff other than in the forbidden characteristic. *Id.* The third type of evidence is evidence that shows the plaintiff was qualified for the job but was "passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.* Plaintiff has adduced all three types of circumstantial evidence.

1. *Systematically better treatment of substantially younger employees*

Plaintiff's primary argument relies on statistical evidence to show that defendant discriminated against him because of his age when it failed to interview him for tier II positions, but interviewed less qualified, substantially younger people instead. The Court of Appeals for the Seventh Circuit has held that a gap in age of ten or more years qualifies as a substantial difference in age discrimination cases. *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir.1997). Plaintiff asks the court to consider the many interviewees who were younger than he, but not at least ten years younger. Plt.'s Br., dkt. # 30, at 5. Plaintiff cites *Hartley*, 124 F.3d at 893, for support, in which the court stated that "[i]n cases where the disparity is less [than ten years], the plaintiff still may present a triable claim if she directs the court to evidence that her employer considered her age to be significant." This evidence is likely to be direct evidence. *Id.* Because plaintiff has not submitted any direct evidence that defendant considered plaintiff's age to be significant, I will focus on substantially younger interviewees only.

Plaintiff argues that for each position to which he applied, defendant interviewed a significant number of substantially younger people. For example, plaintiff argues that the product design consultant position was most similar to his senior underwriting specialist position, yet Zwettler did not offer him an interview for that position. Thirty-three percent of those interviewed for the product design consultant position were ten or more years younger than plaintiff. Of the applicants for the product design manager position, one person (25%) was ten or more years younger than plaintiff. Of the eighteen persons interviewed for the system design consultant position, nine (50%) were ten or more years younger than plaintiff. Finally, six of the thirteen interviewed (46%) for the profit and growth consultant position were ten or more years younger than plaintiff. Moreover, plaintiff argues that in the last year and nine months of his employment with defendant, the number of Personal Lines, non-clerical employees over age 50 fell from 68% of the total employees in the division to 25% of total employees in the division.

Plaintiff's statistics are not compelling. First, the percentages of substantially younger people offered interviews for the tier II positions do not raise any suspicion of age discrimination. None of the four tier II positions had a *majority* of substantially younger interviewees. In all the positions except the system design consultant, the majority of interviewees were in a group that was either less than ten years younger than plaintiff or older than plaintiff. In fact, of the eight people selected for the product design consultant position, one person (13%) was ten or more years younger than plaintiff and two were *older* than plaintiff. In addition, two interviewees for the system design consultant position were older than plaintiff and of the seven people selected for the position, fewer than half (43%) were ten or more years younger than plaintiff and one was older than plaintiff.

■ Even if plaintiff's statistics raised a suspicion of age discrimination, plaintiff must support the numbers with other circumstantial evidence that suggests a discriminatory motive. Statistical evidence "can only show a relationship between an employer's decisions and the affected employees' traits; [it does] not show causation." *Radue*, 219 F.3d at 616. For statistical evidence to be probative in age discrimination cases, it should account for nondiscriminatory explanations of the numbers. *Id.* at 616–17 ("Because the occurrence of adverse employment actions may correlate to older employees for reasons other than intentional discrimination, causation is suggested only when the other variables are shown to be insignificant."). Specifically, plaintiff must show that those interviewed for the four positions were similarly situated to him. Plaintiff attempts to strengthen his statistics by stating that many of the younger applicants were substantially less qualified and lacked significant requirements for the jobs to which they applied. However, plaintiff has not adduced any evidence showing that he has personal knowledge about the abilities and qualifications of his peers. Fed. R.Civ.P. 56(e); *Balderston v. Fairbanks Morse Engine*, 328 F.3d 309, 322 (7th Cir. 2003) (plaintiff's use of own affidavit insufficient to show that substantially younger employee unqualified for position).

For example, plaintiff contends that Johnston was not a chartered property casualty underwriter, even though defendant required that designation for the product design manager position, and that Johnston did not have any management experience. Plaintiff fails to show that he has personal knowledge of Johnston's qualifications. Moreover, plaintiff admits that he did not meet all the requirements of the position but still maintains that he deserved an interview. Plt.'s PFOF, dkt. # 38, ¶ 50.

Another example of plaintiff's failure to adduce enough evidence is his attempt to show that he is similarly situated to the substantially younger interviewees for the system design consultant position. He states that like 44% of the interviewees, he did not have an extensive computer systems background, a desired skill for the system design consultant position. Plt.'s PFOF, dkt. # 38, ¶ 14. Again, plaintiff fails to show that he has personal knowledge of the interviewees' computer skills and abilities. However, even if I accept plaintiff's argument that 44% of the substantially younger interviewees did not have extensive computer systems backgrounds, plaintiff fails to show that he was similarly situated to the substantially younger employees in other relevant respects. It is undisputed that Geisler did not grant plaintiff an interview because plaintiff's job preference form showed that he preferred the product design positions over the system design positions. Plaintiff

says nothing about the job preferences of the substantially younger interviewees.

Furthermore, plaintiff has failed to adduce evidence that defendant had concerns about the other candidates that were similar to the concerns it had about him. It is undisputed that Zwettler, the hiring director for the product design manager position, had concerns about plaintiff's performance on the boat rewrite project. It is also undisputed that Zwettler expressed concern about plaintiff's ability to seek input from others in the April 2001 performance assessment. These are legitimate concerns that could influence an employer's decision to interview someone for a leadership position. "Employers, not employees or courts, are entitled to define the core qualifications for a position, so long as the criteria utilized by the company are of a nondiscriminatory nature." *Cerutti*, 349 F.3d at 1064; *see also Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 765 (7th Cir.2001) ("What the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with.").

It is undisputed that defendant required excellent communication skills and the ability to work with other staff for the profit and growth consultant position and that in reviewing candidates for the position, Thedinga reviewed applicants' recent performance assessments. As noted earlier, Zwettler had stated in plaintiff's most recent performance assessment that he needed to work on seeking input from others. Plaintiff offers no evidence that the performance assessments of substantially younger interviewees for the profit and growth consultant position showed similar concerns. Plaintiff fails to negate obvious, alternative explanations for the decision not to interview plaintiff for any of the positions for which he applied. *See Radue*, 219 F.3d at 617 (plaintiff fails to establish case under direct method by fail-

ing to suggest why obvious, alternative explanations were likely not actual reasons for layoffs). Similarly, assuming plaintiff's numbers are accurate, plaintiff neglects to account for any obvious, alternative explanations for the substantial decline in the number of employees over age 50 following the reorganization, such as retirement, transfer or death.

With the scant evidence propounded by plaintiff, a reasonable jury could not infer that he was similarly situated to any of the other candidates or that defendant discriminated against him when it declined to interview him for the tier II positions. *Radue*, 219 F.3d at 617 (because plaintiff neglected his burden of showing through statistical evidence that his inability to find another position was result of intentional discrimination, he has not established case under direct method); *see also Koski v. Standex International Corp.*, 307 F.3d 672, 679 (7th Cir.2002) (in addition to statistical evidence, plaintiff should have offered specific information that employees were terminated because of their age). Without more circumstantial evidence pointing toward age discrimination, plaintiff's statistical evidence does not help his case.

### 2. Suspicious timing

Plaintiff contends that his April 16, 2001 performance assessment is suspect because Zwettler conducted it after only eight months of supervising plaintiff and just a few months before defendant refused to interview him for the tier II positions. Plaintiff asserts that this is the first time in his 29–year career with defendant that his supervisor conducted performance assessments more often than every twelve months. Plt.'s PFOF, dkt. #38, ¶131. Although defendant alleges that Zwettler conducted performance assessments at the end of eight months for those employees that he had not hired because he had not

previously interviewed them, plaintiff contends that the eight-month performance assessment was a setup to eliminate plaintiff and his senior colleagues during the reorganization. The undisputed fact is that Zwettler conducted performance assessments on *all* the employees he had not hired. This fact undermines plaintiff's contention that Zwettler was targeting him by conducting an early performance assessment of him. Furthermore, unless plaintiff had evidence that all the employees Zwettler assessed early were older, there is no basis upon which a reasonable jury could infer that Zwettler's early performance assessments constituted age discrimination.

Schwartz's practice of conducting performance assessments a little over one year apart does not raise suspicions about Zwettler's decision to conduct such assessments on a different schedule. "[D]ifferent supervisors may exercise their discretion differently." *Radue*, 219 F.3d at 618. Plaintiff has not offered any evidence showing that Zwettler "cooked" the timing and content of his performance evaluation to eliminate him or his senior colleagues because of their age. *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992) ("To make progress, the plaintiffs had to come up with evidence implying that the performance evaluations had been 'cooked' in order to do in the older workers."). For example, plaintiff offers no evidence that Zwettler "expressed discriminatory attitudes, or acted in discriminatory ways, on other occasions." *Id.* He neglects to identify which senior colleagues Zwettler assessed early, their ages and what happened to them after the reorganization. Without such evidence, it is difficult for plaintiff to argue that the early performance assessment was part of a plan to oust the older workers. Plaintiff does not say whether defendant interviewed some of his senior colleagues for tier II positions. Without more evidence, a reasonable jury could not conclude that Zwettler conducted the eight-month performance assessment for the purpose of age discrimination.

### 3. *Pretext*

Plaintiff makes several arguments to discredit defendant's reasons for not interviewing him for tier II positions. First, he argues that one can infer pretext because he was more qualified than the substantially younger interviewees. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (where employer's proffered nondiscriminatory reason for employment decision is that it selected most qualified candidate, evidence of applicant's competing qualifications does not constitute evidence of pretext unless those differences are so favorable to plaintiff that there can be no dispute among reasonable persons of impartial judgment that plaintiff was clearly better qualified for position at issue). However, plaintiff provides insufficient evidence to show that he was more qualified for the tier II positions than the substantially younger interviewees. General assertions are not enough, particularly when plaintiff has no personal knowledge of those qualifications. *See James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir.1998) ("[S]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment."); *see also Mills v. First Federal Savings & Loan Association*, 83 F.3d 833, 841–42 (7th Cir. 1996) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

Second, plaintiff attacks the accuracy of defendant's negative assessment of him, such as Zwettler's negative comments on the April 16, 2001 performance assess-

ment, Geisler's and Thedinga's belief that plaintiff lacked communication skills and Zwettler's belief that there were problems with the boat rewrite project. Plaintiff offers as evidence glowing performance assessments conducted by Schwartz, numerous documents praising plaintiff for good work, affidavits from co-workers attesting to the success of the boat rewrite project and plaintiff's abilities in general, and his own statements regarding his qualifications for the tier II positions.

The positive performance assessments conducted by Schwartz, the affidavits by plaintiff's co-workers attesting to the success of the boat-rewrite project and previous accolades do little to discredit the negative comments expressed by Zwettler in the April 2001 assessment or the opinions formulated by Zwettler, Geisler or Thedinga. As noted earlier, different supervisors may exercise their discretion differently. *Radue*, 219 F.3d at 618 ("Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently."). Supervisors that honestly believe they have legitimate, nondiscriminatory reasons for taking an adverse employment action do not violate the Age Discrimination in Employment Act. *Balderston*, 328 F.3d at 323 ("The only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs.").

The evidence shows that Zwettler, Geisler and Thedinga had legitimate, nondiscriminatory reasons for denying plaintiff an interview for a tier II position. For example, it is undisputed that defendant rolled out the boat rewrite project around the same time that Zwettler replaced Schwartz as plaintiff's supervisor. Plaintiff argues that Zwettler could not have been able to assess from the boat rewrite project plaintiff's ability to fully run and complete a project and get all necessary input from others because Zwettler did not begin supervising plaintiff until after he had completed most of the work on the project. It is true that Schwartz and Zwettler praised plaintiff for his work on the boat rewrite project on June 12, 2000, when defendant first rolled out the project. However, it is difficult for a supervisor to know the true success of a project until after implementation. It is undisputed that after the roll out, Zwettler talked to plaintiff about concerns expressed by the field agents about the boat rewrite project and asked plaintiff three times to modify the policy. In addition, plaintiff does not dispute that after the roll out, Zwettler had concerns about the project, became frustrated with plaintiff's performance on the project, discussed his concerns with Salzwedel and that Salzwedel questioned whether the field was ever really happy with the project. Plaintiff states that he and his co-workers were unaware of any complaints regarding the boat rewrite project. However, if plaintiff, the project lead, did not hear about any complaints regarding the boat rewrite project, then it is unlikely that his co-workers would have heard such complaints.

It is undisputed that Zwettler conducted the April 2001 performance assessment after the boat rewrite project roll out. Geisler and Thedinga used the candidate's most recent performance review as part of their evaluation of potential tier II candidates, in addition to the job preference form. It is undisputed that Salzwedel attributed plaintiff's inability to get an interview for the tier II positions to Zwettler's assessment of plaintiff's job performance. A reasonable jury could not find Zwettler's negative comments on the April 16, 2001 performance assessment to be discriminatory.

Plaintiff's own assessment of his communication and other skills is "insufficient to contradict an employer's negative assessment of that ability." *Gustovich*, 972 F.2d at 848. "Such statements may create a material dispute about the employee's ability but do nothing to create a dispute about the employer's honesty—do nothing, in other words, to establish that the proffered reason is a pretext for discrimination." *Id.; see also Balderston*, 328 F.3d at 323 (plaintiff's own belief that he was best candidate for job is irrelevant to question of pretext). Even if plaintiff's self-assessment is accurate, so long as the beliefs held by Zwettler, Geisler and Thedinga were honest, there is no showing of discrimination. *Balderston*, 328 F.3d at 324 ("A reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."). Plaintiff fails to show that Zwettler, Geisler and Thedinga did not honestly believe their own opinions.

Plaintiff may have been shocked to learn that defendant did not select him to interview for a tier II position, especially after receiving a significant raise and an overall positive assessment a few months before. But previous positive performance assessments may not carry any weight when a company reorganizes itself. In such a situation, it is not unusual for the employer to evaluate its current employees for skills "necessary to perform *prospectively* in a manner consistent with the company's newly devised, increased workplace expectations." *Cerutti*, 349 F.3d at 1064.

Plaintiff argues that the tier II positions were comparable to his senior underwriting specialist position, particularly the product design consultant position. However, Zwettler thought the reorganization created two fundamental positions: a subject matter expert and a management position that could lead big projects and communicate effectively. It is undisputed that Zwettler thought that plaintiff was excellent at focusing on a specific task, being the expert and following up on research. Zwettler's view of plaintiff as a better subject matter expert than manager would explain why he encouraged plaintiff to apply for tier III positions, particularly product design specialist.

The evidence does not suggest that Zwettler expected the tier III positions to have a lower salary than plaintiff's current salary. When Zwettler learned of the salary ranges for the different positions after the April 16, 2001 assessment, he expressed concern to human resources. Plaintiff admits that the primary reason he did not apply for tier III positions was the lower salary range. He does not argue that the tier II positions were a *better* match for his skills and abilities, only that he was fully qualified for the positions. It is perfectly reasonable for an employer to deny an interview to an applicant that meets the minimum qualifications for a position, especially when competition is stiff. Because plaintiff does not put into evidence the specific qualifications of the other interviewees of the tier II positions, a reasonable jury could not infer that defendant interviewed other candidates rather than him only because they were substantially younger.

To the extent plaintiff wishes the court to evaluate his credentials over the substantially younger interviewees without any evidence of discriminatory animus on the part of defendant, he asks the impermissible. First, "this court does not sit as a super-personnel department that reexamines an entity's business decisions." *Balderston*, 328 F.3d at 324. Second, plaintiff fails to provide evidence to allow the court to compare his qualifications with those of the substantially younger interviewees. Because plaintiff fails to adduce enough circumstantial evidence showing

that defendant had a discriminatory motive for refusing to interview him for tier II positions, his case fails under the direct method.

## B. *The Indirect Method*

The parties make their arguments using the indirect, burden-shifting method. However, at least in this case, both the direct and indirect method use the same, circumstantial evidence. *See Gorence*, 242 F.3d at 761 (third type of circumstantial evidence in direct case substantially same as evidence required under *McDonnell Douglas*). Thus, I have already addressed most of plaintiff's arguments under the direct method analysis. However, for thoroughness, I will apply the relevant facts to the indirect method, if only briefly.

Under the indirect method, plaintiff must first establish a prima facie case of discrimination. *Radue*, 219 F.3d at 617 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). For age discrimination cases, the plaintiff must show 1) that he was in the protected age group of 40 or older; 2) he was performing his job satisfactorily or was qualified for the job for which he applied; 3) he was discharged, not hired, not promoted, etc.; and 4) other similarly situated employees who were substantially younger than he was were treated more favorably. *Hartley*, 124 F.3d at 890; *Radue*, 219 F.3d at 617. If the plaintiff meets his burden, the burden of production shifts to the defendant to articulate nondiscriminatory reasons for refusing to interview him for Tier II positions. *Hartley*, 124 F.3d at 890. Once the defendant meets its burden of production, plaintiff must demonstrate that defendant's reasons are not true, or pretextual. *Id.*

The parties do not dispute the first three elements of the prima facie case. Therefore, plaintiff must show that other similarly situated employees who were substantially younger than he were treated more favorably. However, I have concluded that plaintiff has failed to adduce sufficient evidence to show that the substantially younger interviewees were similarly situated to him. Plaintiff's self-serving assertions as to his qualifications and the qualifications of others will not defeat a motion for summary judgment. *See James*, 137 F.3d at 1007; *Mills*, 83 F.3d at 841–42. Because plaintiff is unable to establish a prima facie case, his claim of age discrimination fails under the indirect method.

## C. *Constructive Discharge*

Plaintiff makes a separate argument regarding constructive discharge that I will address, although it is unnecessary to the resolution of defendant's motion. Plaintiff argues that defendant's failure to interview him for tier II positions was the equivalent of a constructive discharge because plaintiff's only other option would have been to apply to a tier III position, in which he would have $20,000 less pay over two years. Plaintiff asserts that such a significant reduction in pay and status would have made his working conditions intolerable.

■■■■■ Constructive discharge occurs when an employee is not fired but quits because the working conditions have become so intolerable that a reasonable person in the employee's position would be compelled to resign. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir.1997); *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998). Although other circuits have entertained the interesting question whether a significant cut in pay translates into intolerable working conditions, I do not need to join them. *See, e.g., Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998) (finding jury was free to infer that reduction of compensation, from $60,000 plus override, to $26,000 without override, constituted con-

dition so difficult that reasonable person in plaintiff's shoes would have felt compelled to resign). Plaintiff must demonstrate that the working conditions were intolerable because of impermissible *age discrimination*. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir.2001). I have concluded that plaintiff has failed to link defendant's refusal to interview plaintiff for the tier II positions to any discriminatory animus by defendant. *Id.* (affirming summary judgment for defendant on constructive discharge claim because plaintiff failed to link conditions of his employment to any age-related bias on the part of defendant employer). Because plaintiff has not shown that his possible reduction in pay related to impermissible age discrimination, he did not suffer a constructive discharge when defendant declined to interview him for tier II positions.

Because plaintiff has failed to show that defendant's refusal to interview him for tier II positions was the result of age discrimination under either the direct or indirect method, I will grant defendant's motion for summary judgment.

## ORDER

IT IS ORDERED that

1. The motion for summary judgment by defendant American Family Mutual Insurance Company is GRANTED;

2. The clerk of court is directed to enter judgment for defendant and close this case.